**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KEITH LARSON,<br><br>Defendant. | Case No. 12-cr-00886-BLF-1<br><br>**ORDER RE: MOTION TO DISMISS FOR OUTRAGEOUS CONDUCT**<br><br>[ECF 142] |

The Defendant, Keith Larson ("Larson"), has been charged in a two count Indictment with violation of 18 U.S.C. § 2241(c), Attempted Aggravated Sexual Abuse of a Child, and § 2423(b), Travel with Intent to Engage in Sexual Conduct with a Minor. On January 30, 2015, Defendant filed a Motion to Dismiss Indictment for Outrageous Government Conduct and Request for Evidentiary Hearing.[1]  ECF 142.  The Court has considered the arguments of the parties, the briefing, and the relevant legal authorities.  For the reasons discussed below, the Motion to Dismiss is DENIED.

**I.  BACKGROUND**

Larson has been charged in a two count Indictment with violation of 18 U.S.C. § 2241(c), Attempted Aggravated Sexual Abuse of a Child, and § 2423(b), Travel with Intent to

---

[1] Defendant has since withdrawn his Request for an Evidentiary Hearing. ECF 146.  At the hearing the Court confirmed with Defendant that he intended for the Court to determine the Motion based on the evidence submitted to the Court in support of the Motion.

Engage in Sexual Conduct with a Minor. The criminal charges against Defendant arise from a sting operation which began on September 10, 2012, when Defendant initiated an on-line chat in a chat room with undercover Homeland Security Special Agent Scott Beagle ("Agent Beagle"). At issue in this motion is the propriety of the chats between Defendant and Agent Beagle.

### A. The Sting Operation led by Agent Beagle

On September 10, 2012, Defendant was online in Internet Relay Chat (IRC) room "#0!!!!!!!!!!pedomoms," as was Agent Beagle. In his undercover capacity, Agent Beagle was using the chat handle "fuckmyretard." After seeing the user name "fuckmyretard," Defendant, using his username "J_Smith" queried "fuckmyretard" through a "whois" function. This query permitted Defendant to have a private conversation with "fuckmyretard." During the first IRC conversation, "J_Smith" asked, "you curious or active with yours?" The Agent told Larson that he was looking for someone else to have sex with his daughter so that he could watch.[2] In this same conversation Defendant told Agent Beagle that he, "go[es] to bay area for work often," and that he "was going to be out in a couple of weeks but not now, maybe later." Defendant requested that Agent Beagle share pictures of his daughter, but after Agent Beagle stated that he would not share them, Defendant terminated the conversation.

Chats continued on and off between Defendant and Agent Beagle during the period from September to December 2012, in the same chat room above, as well in the IRC room "+#!Daring Darlings."[3] On October 15, 2012, Defendant initiated contact with Agent Beagle, reminding the Agent of their prior chat. Defendant queried Agent Beagle whether he had sex with his daughter

---

[2] There was no real daughter. For the purposes of the sting operation, Agent Beagle represented that he had an 11 year old developmentally delayed daughter. The exact language of the chat response by Agent Beagle was "[I]'m active with mine and would like to watch someone fuck/abuse her while [I] JO."

[3] Because the import of these chats is central to the parties' arguments regarding whether the government's conduct here rose to the level of being "outrageous," the chats are quoted extensively in this section of the Order. The exchanges occurred between Agent Beagle in his undercover capacity with the screen names of "fuckmyretard" and "caliborn1975," and Larson, with the screen names of "J_Smith" and "joelsmith42m." In certain chats presented here the Agent appears as [undercover].

2

or was curious to start, and again Agent Beagle indicated that he had sex with her.[4]  On October 29, 2012, Defendant again initiated contact and, in that chat, indicated to Agent Beagle that he would be coming to the Bay Area from his home in Colorado.  The on-line conversation between the two lasted for about 20 minutes and included the following from Defendant:  "your [sic] in the bay area right. i am headed to mountain view today is why i ask." [sic].  *See* Govt. Exh. 1 at 1-3.  Defendant reminded Agent Beagle, "we chatted b4 [sic]," "you fuck your daughter and want her to fuck others," "you [sic] near mountain view." *Id*.  When the Agent responded, "bout 15 min," "and about 10 min from the SJ airport," Defendant stated "cool want to pick me up :)." *Id*.  The Agent responded "i could do that if you're serious" [sic], and Defendant said, "i have plans for dinner already but I could fuck her earlier." *Id*.  The Agent asked, "did you want a quick fuck right after you land?" and Defendant responded, "yes," and asked, "how retard [sic] is she," "i would love a pic. i know you nervous though." [sic] *Id*.  Agent Beagle and Larson had a lengthy exchange about the potential logistics for a meeting.  Govt. Exh.1 at 1-4 and 1-5.  Later on October 29, 2012, Defendant re-initiated contact with Agent Beagle, stating:

> &lt;J_Smith&gt; i am at hotel
> &lt;fuckmyretard&gt; cool
> &lt;J_Smith&gt; so you want her fucked still
> &lt;fuckmyretard&gt; not tonight
> &lt;J_Smith&gt; oh my dinner plans got canceled so i was open

After another forty minutes of logistics discussions, Defendant called it off saying, "lets [sic] be safe and skip it i dunno about this," and signed off. *Id*. at 1-8.  No in-person contact was made at that point.[5]

---

[4] Defendant stated near the beginning of the conversation:  "i travel to calif for work some and I think you close by" [sic] and then "do you fuck her or curious to start," to which the Agent responded, "i fuck her. [L]ooking for someone else to so i can watch." [sic].  *See* Govt. Exh. 1 at 1-2.  Defendant responded "ah ok," and terminated the conversation approximately seven minutes after initiating it.  *Id*.

[5] Although not directly relevant to the issue of moving the criminal enterprise forward, the Defendant includes the following conversations in his Motion as evidence that Agent Beagle's chats were outrageous and persistent. From the October 29, 2012 chat: "&lt;fuckmyretard&gt; "ok, fuck the gift, your dick will be the gift." From the December 4, 2012 chat:
> J_Smith: "do you fuck her daily?"
> &lt;fuckmyretard&gt; "not every day"
> J_Smith: "you had her fuck others lately?"

3

After Defendant terminated the October 29, 2012 chat, for the next five weeks there was no contact at all between the Agent and Defendant. On December 4, 2012, Defendant Larson was the one who again initiated contact with the Agent via the chat room. Larson and Agent Beagle had a series of communications regarding a possible rendez-vous predicated on Larson stating that he would be returning to the Mountain View ("MV") area[6]:

```
<J_Smith> hello again
<J_Smith> i am headed out to MV again next week
<J_Smith> i have a car this time
<fuckmyretard> yeah, but will you actually meet?
<J_Smith> will you ? we back and forth so much last time
<J_Smith> point is i will be around if you want to talk and etc
<fuckmyretard> you picked the time/location. i said i was going and you said, "maybe we shouldn't do this"
<fuckmyretard> then u signed off
<J_Smith> ah i think because we back and forth so much
<fuckmyretard> so let's do this right then
<fuckmyretard> let's start now
<J_Smith> ok how so
```

Govt. Exh. 1 at 1-8 and 1-9.

Defendant and the Agent then decided to move the interaction from the IRC chat room to Yahoo Instant Messenger ("YIM"), exchanging Yahoo email addresses. Defendant attempted several Yahoo voice calls but the voice calls did not connect, and the Defendant continued communicating via YIM. That day and the next, Defendant and Agent Beagle exchanged messages for over an hour and a half. *See* Govt. Exh. 5 at 5-1 to 5-3. Defendant

---

        &lt;fuckmyretard&gt; "Just one"
        J_Smith: "How often do you try this?"
        &lt;fuckmyretard&gt; "She's had three others besides me, started in September"
        J_Smith: "Sounds risky on your end of course"
        &lt;fuckmyretard&gt; "It's all good"

[6] Defendant also alerts the Court to the following chat from December 6, 2012 as part of his claim of outrageous conduct:
        J_Smith: How rough do you get with her?
        &lt;fuckmyretard&gt;: sometimes very
        J_Smith: Like slapping her or just ass fuck?
        &lt;fuckmyretard&gt;: Slapping, ass fuck
        &lt;fuckmyretard&gt;: She sort of moans, when we get rough

initiated the exchange on December 6, 2012.  Defendant told the Agent during this exchange:

> joelsmith42m: i am getting a car
> joelsmith42m: you can meet me at airport to start
> joelsmith42m: then meet me again at pool hall
> [undercover]: i sort of just want to meet, make sure i don't get arrested, get her fucked, then we'll work out the rest of the week. get that weight off my shoulders. ya know
> [undercover]: f'n scared
> [undercover]: now that its so real
> joelsmith42m: ok
> joelsmith42m: so is that meet 1st
> joelsmith42m: then meet again to fuck
> joelsmith42m: i dont want to get arrested either
> . . .
> [undercover]:  we meet at airport, I drive you around and you fuck her in my expedition.

*Id*.

On Friday, December 7, 2012, the Agent YIMed Defendant to "finalize our meet," and they sent messages back and forth for over an hour.  *See id*. 5-17 through 5-22.  Those messages included the following:

> J_Smith: you talk to her more last night?
> <fuckmyretard>:  Yeah, I even made her blow me in the car in the garage
> . . .
>  J_Smith: so what did you tell her about me?
> <fuckmyretard>: That daddies friend wanted to be pleased and you can please him in the car
> <fuckmyretard>: then I made her blow me
> <fuckmyretard>: I told her she would be safe and daddy would love to see her do it
> . . .
>  J_Smith: How often do you fuck her?
> <fuckmyretard>: more often than not, I don't want to over do it so it gets old but need it
> . . .
>  J_Smith: Do you get nervous and freaked out over this?
> <fuckmyretard>: Shit yeah, But I know it is worth it when I hear her get fucked in the ass
> <fuckmyretard>: I think that's half the reason, this is so hot, to hear her moan
> <fuckmyretard>: Oh yeah
> <fuckmyretard>: And looking in the rear view mirror would be so fucking hot
> . . .
> joelmith42m: So was she into your cock or you just rubbed her pussy and she took it?
> Caliborn1975: Oh yeah
> joelsmith42m: Which?
> Caliborn1975:  Both over time

Later that night, Defendant sent a message to the Agent that stated: "i have to admit i am kinda freaking. She is fucking young and makes me nervous." *Id*. at 5-22.

During the morning of Saturday, December 8, 2012, the men messaged back and forth for another hour.

5

> Caliborn1975: Cool, oh I did her in the back of the car sort of hard last night, just to let her know how it was going to be"
>
> . . .
>
> joelsmith42m: So why do you want to share your daughter?"
> joelsmith42m: You have her now and less risk"
> Caliborn1975: I think that's half the risk and what makes it so hot"
>
> . . .
>
> Caliborn1975: She just wants to please her dad and what he wants"
>
> . . .
>
> joelsmith42m: You want her to try pussy as well?"
> Caliborn1975: Yeah, go"
> Caliborn1975: Gonna have one on Jan 11"
>
> . . .
>
> Caliborn1975: I roll up, get out open back, you put in luggage, we shake hands, you fuck her and catch on nut.."
>
> Caliborn1975: She loves ass fucking....I can't wait to listen and watch in the mirror
>
> . . .
>
> Caliborn1975: I show her where she's gonna get fucked and she didn't even freak.

*Id*. at 5-23 through 5-34.

Two hours later, Defendant sent the message: "if you dont [sic] get an email from me before the flight then it is a no go. Just so you know. I dont [sic] want you driving around for nothing. I still am nervous over this ... want it yes...but nervous." *Id.* at 5-34. The Agent did not respond until much later on the evening of December 8: "ok, i'm nervous too . . . hopefully it works out. . .just hit me up prior to let me know your thoughts." *Id*.

On Sunday, December 9, 2012, the day Defendant was allegedly set to travel, the Agent sent another message: "[A]t least give me the respect of emailing me prior to boarding no matter what. This is the second time trying to set this up." *Id*. Defendant sent Agent Beagle a message and also tried to contact the Agent via Yahoo email. *See* Govt. Exh. 8 at 8-12. Defendant responded to the Agent's last YIM: "[w]e both paranoid so skip it we better to be safe than sorry." Govt. Exh. 5 at 5-35.

At 3:39 p.m., Defendant sent Agent Beagle an email: "My flight is currently on time. I will email if it changes or when I land." *Id*. at 8-14. And then, at 4:24 p.m., Defendant emailed the Agent simply: "Boarding." *Id*. at 8-15. Defendant emailed again at 7:20 p.m., after landing in San Jose on Southwest Airlines. After some brief email correspondence about car rental logistics, Defendant emailed the Agent: "You going to drive up[?]" *Id*. The Agent responded: "Yeah. U on rental side or baggage claim," to which Defendant answered: "Baggage." *Id*. at 8-19. Defendant

6

1 was arrested less than five minutes later.

### B. Training Standards for Sting Operations

Defendant, relying on the discovery provided by the government, states that, prior to his chat sessions with Larson, Agent Beagle had attended only a single multi-day course in on-line undercover operations. Defendant presents the opinion of his proposed expert witness on training, Ms. Francey Hakes. Ms. Hakes was the National Coordinator for Child Exploitation Prevention and Interdiction from January 2010 to March 2012. In that role Ms. Hakes was responsible for setting policy for all 93 U.S. Attorney's offices in child exploitation cases, which included but was not limited to, policies for acceptable undercover conduct, and protecting against entrapment. She also coordinated nationwide training, including for undercover chat cases.

It is Ms. Hakes' opinion, as discussed further below, that the actions of Agent Beagle were "egregious and are uniformly condemned" and that Agent Beagle's chat handle and the initial chats were far outside accepted norms for law enforcement, and violated the minimum standards for undercover operations in child exploitation matters. It is on this opinion, as well as the academic publication Ferraro and Casey, *Investigating Child Exploitation and Pornography – The Internet, The Law and Forensic Science* at 110 (Elsevier Academic Press 2005), that Defendant bases his argument that Agent Beagle's chats were so beyond acceptable investigative standards as to rise to the level of outrageous government conduct.

## II. LEGAL STANDARD

Outrageous government conduct occurs when the actions of law enforcement officers or informants are "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431-32 (1973). Dismissing an indictment for outrageous government conduct, however, is "limited to extreme cases" in which the defendant can demonstrate that the government's conduct "violates fundamental fairness" and is "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Stinson*, 647 F.3d 1196, 1209 (9th Cir. 2011) (internal quotation marks omitted). This is an "extremely high standard." *United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013); *United States v. Garza-Juarez*, 992 F.2d 896, 904 (9th Cir. 1993)

1  (*quoting United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991)).

2  The dismissal of an indictment because of outrageous government conduct may be predicated on alternative grounds: either a violation of due process, or on the court's inherent supervisory powers. *United States v. Luttrell*, 889 F.2d 806, 811 (9th Cir. 1989).[7] Where the defendant invokes the Court's inherent supervisory power, the Court may grant the motion for any of the following three reasons: "to remedy a constitutional or statutory violation; to protect judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; or to deter future illegal conduct." *United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991); *see also United States v. Hasting*, 461 U.S. 499, 505 (1983).

## III. DISCUSSION

As the government notes, instances where a court has granted a motion to dismiss for outrageous government conduct are very rare indeed.[8] Unlike an entrapment defense, in assessing outrageous government conduct, judicial scrutiny focuses on the government's actions – not the alleged actions of the defendant. *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991) (Indictment may be set aside for outrageous government conduct whether or not defendant was predisposed to engage in criminal activity). The government's conduct is reviewed objectively without regard to defendant's predisposition. *United States v. Bogart*, 783 F.2d 1428, 1435 (9th Cir. 1986) *vacated in part on other grounds, United States v. Wingender*, 790 F.2d 802 (9th Cir. 1986). The court must grant deference to law enforcement in its methodologies. *See United States v. Gurolla*, 333 F.3d 944, 950 (9th Cir. 2003) ("government agents may lawfully use methods that are neither appealing nor moral if judged by abstract norms of decency"). *See also United States v. Mosley*, 965 F.2d 906, 910 (10th Cir. 1992) (wide latitude is accorded to the government to determine how best to fight crime). This deference ends only where the conduct by the government is so shocking as "to violate the universal sense of justice" and is "antithetical to

---

[7] Defendant argues in this Motion only an alleged violation of his due process.

[8] The *Black* Court states that as of the time of its decision in 2013, there were only two reported decisions in which federal appellate courts had reversed convictions due to outrageous government conduct. *Black*, 733 F.2d at 302, citing *United States v. Twigg*, 588 F.2d 373 (3rd Cir. 1978) and *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971).

fundamental notions of due process." *Gurolla*, 333 F.3d at 950 ("defense [of outrageous government conduct] limited to extreme cases"); *United States v. Simpson*, 813 F.2d 1462, 1468 (9th Cir. 1987).

The overall premise of Defendant's argument is that Agent Beagle's "behavior [in the chat room] violated virtually every rule in the book for undercover operations," especially what Defendant characterizes as Agent Beagle's "persistent and graphic encouragement" of Defendant; and that as a result, Agent Beagle manufactured this crime. Def. Motion at p. 13. However, the Ninth Circuit instructs that "[t]here is no bright line dictating when law enforcement conduct crosses the line between acceptable and outrageous, so 'every case must be resolved on its own particular facts.'" *Black*, 733 F.3d at 302 (quoting *United States v. Bogart*, 783 F.2d 1428, 1438 (9th Cir. 1986)).

Recently, in the *Black* case, the Ninth Circuit collected the various relevant factors for courts to consider in assessing the outrageousness of the Government's conduct into a six factor analysis: (1) the known criminal characteristics of the defendant; (2) individualized suspicion of the defendant; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendant to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue. *Black*, 733 F.3d at 303-04.[9] This list of factors is not intended to serve as "a formalistic checklist," but is meant to guide courts through a "totality of the circumstances" analysis. *Id.* As set out in *Black*, the first three factors of the analysis focus on the government's role in initiating the sting and recruiting the defendant to participate, and the remaining factors look to the government's subsequent conduct and compelling need. *Id.*

---

[9] Defendant, citing *Black*, 733 F.3d at 303, argues that in sting operations, "close scrutiny" is necessary. However, the *Black* court was concerned with the fact that in reverse stash house operations the government controls both the amount and cost of the drugs, and also may have found its participants in economically disadvantaged neighborhoods with the lure of a large payout, factors all warranting careful consideration. Such factors are not present here.

9

Consistent with the holding in *Black,* this Court has considered the evidence submitted under the relevant factors. In this case, the content of the communications between the Agent and Defendant are memorialized in chats and thus their content is undisputed. Additionally, the Court has considered the expert declaration of the defense expert Francey Hakes, and the government's proffered declaration of Gary M. Wetzel, Homeland Security Special Agent. For purposes of this motion, the Court will credit Ms. Hakes' testimony regarding minimum standards and best practices for conducting undercover internet investigations but also finds, based on Agent Wetzel's declaration, that there is no evidence before the Court that DHS had adopted those minimum standards during the relevant time period.[10]

### A. Defendant's Known Criminal Characteristics

A defendant's "known criminal characteristics" includes the "criminal background or propensity the government knew about when it initiated its sting operation." *Black*, 733 F.3d at 304. Where the government agents "actually have knowledge that a particular person had engaged in similar conduct in the past – or at least had suspicion based on identifiable facts – then the government should and does have free rein consistent with constitutional restrictions." *Id*. In *Black*, while the government agents were not aware of the defendants' criminal propensity or history when they first recruited them, during the course of the sting the defendants admitted to the undercover agents that they had engaged in stash-house robberies before. *Id.*

Larson argues in contrast here that at no point did he make any representations that he had previously engaged in any criminal activity. The government concedes that Defendant does not have any prior criminal convictions nor does the evidence show that Defendant admitted to any criminal activity in his chats with Agent Beagle. The government argues that this prong of the analysis is still met because Defendant approached the undercover agent in a chat room intended as a forum for adults to discuss sex with children, giving the Agent a valid general suspicion that those in the chat room like Defendant would have an identifiable interest in pedophilia.

---

[10] At the hearing on this Motion, the Court queried defense counsel as to the foundation for Ms. Hakes' opinions, as her declaration contains no references to specific documents, rules or other pronouncements of DHS, or even any other federal government agency as to their minimum standards for investigation. Counsel could point to no specifics in the record.

1   Defendant's repeated presence in that chat room, and any discussions he may have had in there,

2   while relevant to some of the factors of the *Black* test below, do not, however, constitute a "known

3   criminal background."  Thus, the government has not established this first prong.

   **B.   Individual Suspicion of the Defendant**

Closely related to the first factor is the government's individualized suspicion of the defendant.  The Ninth Circuit does not require that the government have "individualized suspicion of a defendant's wrongdoing before conducting an undercover investigation."  *Black*, 733 F.3d at 304.  As discussed below, the Ninth Circuit has found government conduct permissible when targeting individuals in a category of persons the government had reason to believe were involved in criminal activities.

In *United States v. Emmert*, 829 F.2d 805 (9th Cir. 1987), Emmert was an undergraduate at the University of California, San Diego.  He became involved in the relevant drug transaction after his roommate, Thomas Powell, told him about a $200,000 finder's fee offered by Martin Mosteller, a confidential government informant, for locating a substantial supply of cocaine.  On appeal from his conviction, Emmert argued that the government conduct was outrageous, in part because the government agent enticed him by offering a $200,000 finder's fee for relatively little work when Powell and Emmert had never bought or sold drugs previously.  The Court found that the government's conduct was within bounds, as even though Mosteller did not know whether Powell was a drug dealer, he knew Powell was probably in a position to know someone who was, by virtue of attending a party where cocaine was served.  Under those circumstances, asking Powell whether he knew a drug supplier was not outrageous.  *Id*. at 812.

The government argues that like in *Emmert*, Agent Beagle's conduct was not outrageous when he concentrated his undercover efforts in a "pedomoms" chat room, and responded to Defendant's repeated approaches to him in that chat room.  Defendant counters that Larson chatting in the "pedomoms" chat room is not a basis to suspect that Larson was engaged in wrongdoing, as many courts have recognized the fantasy nature of Internet chatting.  *See, e.g. United States v. Hofus*, 598 F.3d 1171, 1177 (9th Cir. 2010).

As the *Emmert* case holds, it was not outrageous conduct for Agent Beagle to suspect that

11

those who responded to him in the "pedomoms" chat room may have an interest in criminal activity with a minor. The Court finds this factor in the government's favor, although under the facts of this case, this factor in and of itself, carries little weight.

### C. The Government's Role in Creating the Crime of Conviction

Defendant asserts that Agent Beagle's screen name and the improper and offensive chats by Agent Beagle "created the crime of conviction." This prong and the next are the true focus of the Defendant's arguments, and the analysis of them, under *Black*, is intertwined, as the Court must look both at the government's actions at the start in recruiting Defendant to join the conspiracy and whether any potential overreaching by the government during the initiation was overcome by the Defendant's subsequent actions. *Black*, 733 F.3d at 306.[11]

In *Black,* the majority agreed with the dissent that most Ninth Circuit decisions rejecting claims of outrageous government conduct were predicated on the government targeting an existing scheme or an individual already suspected of wrongdoing before initiation of the sting operation. The majority found, however, that failure of this factor alone was insufficient to establish a due process violation. Looking to *United States v. Bagnariol*, 665 F.2d 877 (9th Cir. 1981) and *United States v. Emmert*, 829 F.2d 805 (9th Cir.1987), the Court noted that it had rejected outrageous government conduct claims where the government initiated a sting operation without targeting an existing scheme or suspecting an individual of wrongdoing. The defendants' subsequent actions in *Bagnariol* and *Emmert* provided sufficient proof that they were contemplating criminal activity. In *Black,* as well as in those two cases, the Ninth Circuit has held that "although the initial targeting of the defendants is troubling, it is counterbalanced by the defendants' enthusiastic readiness to participate in the stash house robbery, by their representations that they had committed stash house robberies in the past, by their independent role in planning the crime and by the absence of government coercion or pressure." *Black*, 733 F.3d at 298. In *Black*, the Ninth

---

[11] The *Black* Court ultimately found that "[a]lthough the initiation of the reverse sting operation here raises questions about possible overreaching . . . the defendants have not met the 'extremely high standard,' of demonstrating that the facts underlying their arrest and prosecution are so 'extreme' as to 'violate[ ] fundamental fairness' or are 'so grossly shocking . . . as to violate the universal sense of justice.'" *Black*, 733 F.3d at 298 (citations omitted).

Circuit found that the government had "created the proposed crime, initiated contact with the defendants . . . and set the bait – all without any previous individualized suspicion – or even knowledge – about the defendant's criminal history or activities." The *Black* Court's concerns were mitigated by the fact that once the agent set his bait, the defendants "responded without further inducement by the government." *Id.* at 306-307.

In its Opposition to the Motion to Dismiss for Outrageous Government Conduct, the government has provided the Court with the full text of all of the chats between Agent Beagle and the Defendant. The Court has carefully reviewed all of these chats. The Court finds that the chats demonstrate that while the chat handle of the Agent may have been somewhat out of bounds, Defendant was the one to approach the Agent, and he was the one to initiate conversations on at least five subsequent occasions. Defendant was also the one to propose a meeting on his travel to the Bay Area. Defendant called off the first meeting in October 2012, but was the one to reinitiate contact in December 2012. These factors, as well as those discussed below looking to the chats themselves, demonstrate to the Court that any initial overreaching caused by the Agent's very direct chat handle, was subsequently overcome by Defendant's eager participation in the sting.

**D.   Government's Encouragement of the Defendant to Commit the Crime**

This factor looks at the post-initiation conduct of the government. The government may not manufacture the crime. *Sherman v. United States*, 356 U.S. 369, 372 (1958) (the "function of law enforcement is the prevention of crime and the apprehension of criminals. . . that function does not include the manufacturing of crime"). A court must consider the extent to which the government during the planning process encouraged the defendant to commit the crime charged, "with mere encouragement being of lesser concern than pressure or coercion." *Black*, 733 F.3d at 308.

Defendant argues that Agent Beagle's encouragement was "persistent and graphic" and violated "virtually every rule in the book for undercover operations." Defendant argues in effect, that by not following the guidelines set out by the ICAC task force for best practices in undercover

operations relied on by his expert, Francey Hakes, Agent Beagle's actions were *per se* coercive.[12] Defendant's expert opines that when the government agent acted not in conformity with the ICAC standards and introduced the topic of sex, it risked "ensnaring innocent fantasy chatters" and also created a substantial risk that the chats would be misinterpreted and not reflective of real intent.

This Court begins its analysis by acknowledging that Agent Beagle's conduct could be categorized as aggressive, especially when viewed standing alone. However, when the language is placed in the context of the other chats Defendant seeks to admit at trial, Agent Beagle's chats are not inconsistent in tone or explicitness. *See, e.g. United States v. Mayer*, 503 F.3d 740, 755 (9th Cir. 2007) (no outrageous conduct where "the terms of endearment in [the agent's] e-mails seemed to be a common language in this community").

The Court finds that it need not measure Agent Beagle's actions against the ICAC standards, as it is clear from the case law that the conversations between Defendant and Agent Beagle, while indeed graphic and persistent, are more akin to what has been held by courts to be acceptable encouragement. Thus, Agent Beagle's chat handle and chats do not meet the standards for coercion sufficient to entitle Defendant to one of the exceedingly rare dismissals for outrageous government conduct. *Black*, 733 F.3d at 308. *See also, United States v. Mayer*, 503 F.3d 740, 755 (9th Cir. 2007) (finding use of sex as an enticement not *per se* coercive); *United States v. McClelland*, 72 F.3d 717, 721 (9th Cir. 1995) (noting that while the government agent did "encourage defendant at various times" this did not rise to the level of outrageous government conduct); *United States v. Simpson*, 813 F.2d 1462 (9th Cir.1987). *But see, Greene v. United States*, 454 F.2d 783, 787 (9th Cir. 1971) (Government concedes that agent made the statement, "the boss is on my back" which in the context of the alleged criminal "syndicate" operations could only be construed as a veiled threat).

Even accepting Defendant's premise as true, that Agent Beagle's actions were persistent and graphic encouragement, they were, in fact just that, encouragement.[13] There is no evidence in

---

[12] Defendant conceded at the hearing that conduct which falls just below an agency's internal minimum standards or best practices is not outrageous *per se*.

[13] In certain instances, Agent Beagle's responses to Defendant did not even rise to the level of

14

the record that Agent Beagle coerced Defendant, or placed undue pressure on him. To the contrary, the chat history reveals that Larson was readily able to terminate contact with Agent Beagle and to cancel the first planned meeting without difficulty. In fact, Agent Beagle did not initiate any contact with Larson thereafter. It was Larson who contacted Agent Beagle five weeks later on December 4, 2012, and it was Larson who proposed another meeting. Moreover, the Ninth Circuit has recognized that there is a tolerable level of threats or coercion when viewed in context. *See United States v. Emmert*, 829 F.2d 805, 811 (9th Cir. 1987) (threats coupled with a promise of $200,000 payout not impermissibly outrageous). The Court finds that Defendant played his own independent role in the criminal behavior, not as a result of coercion by the Agent.

### E. Nature of The Government's Participation in the Offense Conduct

In assessing the government's participation in the crime alleged, the Ninth Circuit considers the duration, nature, and necessity of the government's actions. *Black*, 733 F.3d at 308–09. "The duration of the government participation in a criminal enterprise is significant, with participation of longer duration being of greater concern than intermittent or short-term government involvement." *Id*. The nature and necessity of participation focuses on whether the government acted as a partner in the crime or as an observer. *Id*. In *Black*, the government only participated for a short time and provided no weapons, plans, or manpower. The Court found this factor weighed against a finding of outrageous government conduct. *Id*.

Here the operation was completed over just a few months from the time Defendant first contacted the undercover agent, with the majority of the interactions focused on one day in October and five days in December. By the very nature of the sting, the government could not step back and leave the plan in its entirety to the Defendant. The key element of the crime, however, the meeting between Defendant and the alleged child, again was the result of a

---

encouragement, much less coercion. For example, during October 2012, when Defendant was in Mountain View, he contacted Agent Beagle and asked whether Agent Beagle wanted his putative daughter "fucked still" and Agent Beagle responded "not tonight." It was only after Defendant persisted by saying that his dinner plans had fallen through that the conversation continued, leading to the aborted meeting plan. See Exh. 3 to Government Opposition at 3-9. Similarly in the December 8, 2012, conversation when Defendant indicated that the discussed meeting might be a "no go," Agent Beagle responded "hopefully it works out" and "just hit me up prior and let me know your thoughts." See Exh. 4 to Government Opposition at 4-27.

proposition by the Defendant. Defendant also provided the date of his intended arrival and his flight information, without which the meeting could not have occurred. The Agent took no steps to induce the Defendant to travel, nor did the government provide any financial or other assistance to Defendant in making his flight arrangements. *See United States v. Mayer*, 503 F.3d 740, 754 (9th Cir. 2007) (no outrageous conduct where government "did not pay for defendant's trip, coerce him into buying a ticket or plant the idea of traveling for illicit sexual conduct in defendant's mind"). In this regard, the government took more of a back seat role, and therefore its actions do not rise to the level of outrageous conduct in the analysis of this factor.

### F. Nature of The Crime Being Pursued and Necessity for the Government's Actions

The final factor evaluates "the need for the investigative technique that was used in light of the challenges of investigating and prosecuting the type of crime being investigated." *Black*, 733 F.3d at 309. The *Black* court noted that "[t]he government does not have free license to forgo reasonable alternative techniques of identifying and targeting potential suspects before approaching them." *Id*. Identifying individuals who offer children for sex or who seek to procure children for sex without the use of the Internet is difficult, as those crimes typically occur in secret. Sexual assault of children arranged by adults is made easier by the Internet. The anonymity of the Internet adds a new layer of secrecy to a crime committed in the shadows of society. Therefore, as the defense expert acknowledges, the government frequently uses on-line undercover investigations as a means of identifying persons involved in the exploitation of children. This Court is unaware of any court which has held that an undercover internet operation of this type is "outrageous" or even unlawful. Therefore, this factor weighs against a finding of outrageous government conduct.

### IV. CONCLUSION

While Agent Beagle's conduct may have strayed beyond the bounds of what is considered best government practices in sting operations, it is not unlawful for a government agent to use methods that are neither appealing nor moral. Under prevailing Ninth Circuit law as set out in *Black*, the Court finds that, looking at the totality of the circumstances, the government's conduct here does not rise to the extremely high level necessary for dismissal of the Indictment for

1   outrageous government conduct. Defendant's Motion for Dismissal for Outrageous Government
2   Conduct is therefore DENIED.

4   **IT IS SO ORDERED.**

6   Dated:  February 19, 2015

_____
BETH LABSON FREEMAN
United States District Judge